FILED

03 MAR 20 PM 1:10

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

MAR 20 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CURTIS H. STOUT, INC.,            }
                                  }
     Plaintiff,                   }
                                  }   CIVIL ACTION NO.
v.                                }   02-AR-1950-S
                                  }
MIKE ROCHESTER, et al.,           }
                                  }
     Defendants.                  }

### MEMORANDUM OPINION

Before the court is a motion for partial summary judgment by plaintiff, Curtis H. Stout, Inc. ("Stout"), against defendants, Mike Rochester ("Rochester") and Lighting Technologies, Inc. ("LTI"). Stout seeks an injunction and damages, claiming that Rochester, who is its former employee, is in breach of a contract not to compete with it. Because Stout concedes that the issue of monetary damages cannot be decided at this stage, the court hereinafter limits itself to the question of Stout's entitlement to an injunction. A finding of such entitlement will necessarily include a finding of a breach of contract and the existence of some damage.

The original complaint contained a petition for a preliminary injunction. In an earlier ruling, Stout's request for a preliminary injunction was telescoped into its prayer for a permanent injunction because the anticipated evidence bearing on injunctive relief, whether early or late, was going to be the same, making two hearings unnecessary. Stout traded the possibility of

45

obtaining an early preliminary injunction for an expedited discovery schedule, early final disposition and the elimination of an expensive bond in the event a preliminary injunction had been granted.

Rochester filed a counterclaim for severance pay he says was promised him by Stout. The counterclaim is not a subject of the motion now under consideration.

### The Facts Construed in Favor of Rochester

Under summary judgment consideration, all facts must be stated in the light most favorable to the non-movant, in this case, Rochester. In other words, any admissible evidence submitted by Stout will be construed against it and will not be taken as true unless undisputed. Any evidence offered by Rochester will be construed in his favor and taken as true even if disputed.

Before Stout appeared in Rochester's life, Rochester was a successful manufacturers' representative ("rep") for various lighting manufacturers. He had eighteen years of experience. In 1996, he and two others formed a corporation entitled Lighting Technologies, Inc. ("LTI") that became a rep for a number of manufacturers. LTI made bids for its clients or "principals" on various commercial construction projects. At that time, LTI's primary line was manufactured by Thomas Lighting, Inc. ("Thomas"). In 1999, Thomas grossed over $6,000,000 as a result of LTI's sales efforts on its behalf. In 2000, Hubbell Lighting, Inc.

("Hubbell"), a competitor of Thomas, approached LTI and asked it to take on the Hubbell line as its primary line, replacing Thomas. Hubbell's proposition resulted in a five year contract between LTI and Hubbell by the terms of which Hubbell guaranteed commissions to LTI of $30,000 per month for 24 months, plus an incentive commission of 5.3% of sales. Before the said contract was implemented, Hubbell arranged for LTI to negotiate with Stout, which was then a major representative for Hubbell in the southeastern United States. Rochester and another LTI principal met with high level representatives of Stout to work out a deal. As a result, a Letter Agreement was executed among Stout, LTI, Rochester and another LTI owner on May 23, 2000. *Inter alia*, that agreement called for Stout to pay $200,000 to LTI, plus $75,000 over a two year period to Rochester, the object being for Stout to purchase all assets of LTI, including accounts receivable, work-in-progress, office equipment, computers, furniture, literature, samples, etc. The said Letter Agreement further provided: "three management employees [of LTI] agree to sign the CHS [Stout] employment contract as per Attachments." One of the LTI employees referred to was undoubtedly Rochester. The Letter Agreement provided for an effective date of June 1, 2000. As contemplated by the Letter Agreement, an Employment Agreement was presented by Stout to Rochester dated May 31, 2000. For aught appearing May 31, 2000, was the actual date upon which it was presented. Rochester

3

and LTI proceeded to implement the Letter Agreement and both received the substantial considerations provided therein. Also, in compliance with the Letter Agreement, Rochester was paid an annual salary of $90,000 for two years, and Rochester received a term life insurance policy with premiums paid by Stout plus stock options in Stout. After LTI dissolved, as contemplated by the Letter Agreement, Stout rented the space formerly occupied by LTI and began doing the business that LTI had been doing, including the representation of Hubble.

Although Rochester initially balked at signing the employment agreement dated May 31, 2000, as contemplated by the Letter Agreement of May 23, 2000, he finally signed it without changing a word.

To recapitulate, not only did Rochester receive his share of the $200,000 purchase price for LTI's assets, but he received an additional $75,000 for his interest in LTI, plus a salary of $90,000 per year for two years and other things of substantial value. After the two years of guaranteed employment had elapsed he became Stout's "at will" employee.

There is no evidence to suggest that Rochester was not a sophisticated businessman. There is no indication whatsoever in the record that he did not sign both agreements of his own free will, although he asserts that he signed the employment agreement under the threat of losing his job. This contention makes no

sense. Stout never promised him a permanent job. He had legal counsel when he evaluated both agreements, and his obligations under the agreements are unambiguous. The following is representative of Rochester's testimony at this deposition:

> Q. Did you agree to the terms in it [the employment agreement] by signing it?
>
> A. Under duress.
>
> Q. Did somebody put a gun to your head and make you sign it?
>
> A. No.
>
> Q. Did you have a lawyer review it?
>
> A. Yes.
>
> Q. Did your lawyer ask for any modifications to the agreement?
>
> A. I asked for modifications to the agreement.
>
> Q. Did Curtis Stout agree to your modifications.
>
> A. No.
>
> Q. And you went ahead and signed it anyway?
>
> A. Yes.
>
> Q. And by signing it, you understood that you would be bound by its terms?
>
> A. Yes.
>
> Q. And being an experienced businessman who had been in business for over 20 years, you knew that you had to honor those terms?
>
> A. Yes.

On July 7, 2002, shortly after the expiration of Rochester's two year guarantee of employment, he was terminated. The reason or

reasons for this termination are in dispute. Stout cites Rochester's "inefficiency," whereas Rochester says that his firing was arbitrary and was not "for cause." He argues that if he had been fired on account of inefficiency Stout would not have offered him one month's salary as severance pay. This alleged unfulfilled promise of severance pay is the subject of Rochester's counterclaim. If there was consideration for the promise of severance pay it is undescribed. The court sees no relevance to the difference of opinion between the parties over the reason or reasons for Rochester's termination. Its relevance, if any, may appear at the trial of the counterclaim.

After Rochester was terminated, he caused LTI to be reincorporated, and the new LTI, under Rochester's guidance, returned to the business of acting as a manufacturer's representative for various lighting manufacturers, including several that Stout and the earlier dissolved LTI had represented.

The employment agreement that Rochester signed as of May 31, 2000 (although actually signed months later), contains the following pointed clause:

> In order to protect the Employer, its affiliates and their employees from unfair competition through the use of the Employer's Confidential Information or trade secrets, Employee agrees that during and for two (2) years after the termination (whether voluntary or involuntary) of Employee's employment with the employer, Employee will not, either directly or indirectly, on his own behalf or with or for any other entity as an officer, shareholder, partner, employee or agent engage in representing, or acquire the right to represent, any

6

>principal of the Employer in any territory in which Employer or its affiliates represents such principal at any time of the termination of Employee's Employment or has represented such principal at anytime during the six (6) months immediately preceding such termination of employment.

The agreement also provides:

>Marketing information including, without limitation, market definitions, names, addresses, and business history of principals, the identity of principal contacts, customer lists, names, addresses and purchasing history of customers, pricing information, names of customer contacts, the service history of customers, the particular needs and applications of the principal's products by customers and potential customers, prices, commissions on sales, and data pertaining to the needs and requirements of customers and potential customers;. . .

Lastly, the agreement provides:

>Employee agrees to not, without the written permission of the Employer's president, during or for three (3) years after the termination of Employee's employment with the Employer, disclose any Confidential Information to any person or entity, or use any Confidential Information for Employee's own benefit, account for profit, or for the benefit, account or profit of any other person or entity.

The extent to which Rochester's renewed business relationship with Vision Air, EDI, Paramount, Valmont, and Winona (lighting manufacturers that were represented by Stout prior to Rochester's termination), have hurt Stout is a matter of dispute.  Stout contends that it has been injured by Rochester's using and sharing with others confidential information in violation of the non-competition agreement and by contacting Stout's former "principals" (the word "principal" is used in this context to describe a manufacturer), also in violation of the agreement.  Rochester has

submitted an affidavit in which he says: "Talk in the marketplace is that CHS [Stout] has now lost the Hubble line in the northern Alabama and Memphis markets and has not replaced it with another major line." This is an attempt by Rochester to raise a genuine issue as to whether or not Stout is actually competing with Rochester in the relevant market. A knowledgeable Stout witness testified at deposition:

> Q. Are you able to fairly compete in this market, do you think as a manager of CSI [Stout]?
>
> A. Yeah. We're able to compete in the market. Some of the lines we've lost affect our ability to compete on certain or compete for certain business.
>
> Q. What are those?
>
> A. Well, Valmont. I'd say Winona is probably going to hurt us on certain jobs. EDI, Lehigh. Well, basically, all the lines that we've lost in some way affect our ability to compete.

Rochester's self-serving hearsay comment is not admissible evidence. It provides no legitimate contradiction to Stout's evidence to the effect that Stout continues to do business in the Birmingham market, whether or not it does that business at a reduced level after Rochester's departure, and whether or not any reduction in its business was occasioned by Rochester's and LTI's competition.

### The Law Applicable to these Facts

The law of Alabama provides that non-competition agreements are presumptively invalid because they act in restraint of trade

8

and are against public policy. See Ala. Code § 8-1-1. There are, however, two exceptions to this rule, only one of which Stout specifically invokes in this case.

The first exception here applicable, not argued by Stout, recognizes an employer's protectable interest against competition by a former employee. This exception is explained by the Supreme Court of Alabama in *James S. Kemper & Co. v. Cox & Associates*, 434 So. 2d, 1380, 1384 (Ala. 1983), as follows:

> It is clear, as defendants contend, that § 8-1-1, Code 1975, expresses the public policy of Alabama that contracts restraining employment are disfavored. *DeVoe v. Cheatam*, 413 So. 2d 1141 (Ala. 1982). This is so "because they tend not only to deprive the public of efficient service, but tend to impoverish the individual." *Robinson v. Computer Servicenters, Inc.*, 346 So. 2d 940, 943 (Ala. 1977). Nevertheless, the courts will enforce the terms of a covenant not to compete if:
>
> 1. the employer has a protectable interest;
> 2. the restriction is reasonably related to that interest;
> 3. the restriction is reasonable in time and place;
> 4. The restriction imposes no undue hardship on the employee.
>
> *DeVoe v. Cheatam*, 413 So. 2d at 1142.
>
> "In order to have a protectable interest the employer must possess 'a substantial right in its business sufficiently unique to warrant the type of protection contemplated by [a] noncompetition agreement.'" *Id.* at 1142, citing *Cullman Broadcasting co. v. Bosley*, 373 So. 2d 830, 836 (Ala. 1979). In the case of a "post-employment restraint," as in the present case, justification, according to the *Restatement (Second) of contracts* § 188, Comment B (1979), generally must be "on the ground that the employer has a legitimate interest in restraining the employee from appropriating valuable trade information and *customer relationships* to which he has had access in the course of his employment."

9

This language perfectly fits the circumstances of this case and the legitimate and unique business purpose for Stout's and Rochester's negotiating and signing the non-competition and confidentiality agreement. *James S. Kemper* was cited by the Eleventh Circuit as a correct statement of the law of Alabama as recently as February 21, 2003, in *Jenkins Brick Co. v. Bremer*, 2003 WL 367924, ___ F. 3d ___ (11th Cir. 2003).

The second exception to the Alabama prohibition against contracts in restraint of trade is the so-called "good will" exception. Rochester argues that the words "good will" are found in neither of the agreements he signed. There is nothing magic about the words "good will." What matters is whether the parties intended to sell "good will" as that term is understood. Rochester admits that he and LTI sold their business to Stout and that the earlier incorporated LTI agreed to dissolve and to cease doing business by that name. Rochester and LTI agreed to and did hand over the location, employees, tangible assets, accounts receivable to Stout and promised to use their best efforts to transfer LTI's manufacturers to Stout. This is as good as it gets as an illustration of a sale of "good will." Stout bought and paid for the disappearance of LTI and for the loyalty of its key personnel. LTI's reappearance constituted a clear breach of the deal.

Both under the "employee" exception and under the "good will" exception, this particular non-competition agreement is

sufficiently restricted in geographic area and in time frame to be enforceable under the law of Alabama. The agreement was and is a typical one in situations like this one. It does not smack of unconscionability.

Under the "good will" exception, it is necessary that Stout also prove that it is now carrying on a "like business." Rochester disputes Stout's contention in this regard, but it is not necessary that Stout's "like business" be successful or profitable, particularly when any lack of profitability or success may be a byproduct of Rochester's competition that Stout seeks to preclude. It would make no sense for a protected party to lose his protection from competition by the very effectiveness of that competition.

### Conclusion

For the foregoing reasons, Stout's motion for partial summary judgment will be granted, and a permanent injunction will be entered to enforce the non-competition agreement. In all other respects, plaintiff's motion will be denied.

DONE this 20th day of March, 2003.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

11